GEORGE A. MILLER and others, Appellants, v. THE CITY OF
DES MOINES and others, Appellees.

**Municipal corporations:** PUBLIC PRINTING: COMPETITIVE BIDS: DIS-
1  CRIMINATION IN FAVOR OF UNION LABOR.   In letting a contract for
public printing to the lowest responsible bidder, a city council
has no power or jurisdiction to discriminate in favor of a bidder
employing union labor and against those employing non-union
labor, whether authorized to do so by ordinance or not; as such
discrimination tends to monopoly and involves a denial of equality
or right and opportunity.

**Same.**  The fact that the city council made no reference to the em-
2  ployment of union labor, either in its resolutions, notice to bidders
or contract with the successful bidder, was not controlling on the
question of discrimination, where it was otherwise clearly shown
that such was the test in fact applied in awarding the contract,
rather than the character and responsibility of bidders.   Nor is
it material that the amount involved in the controversy is insigni-
ficant when compared with the city's resources, or that the city
officials acted in good faith in awarding the discriminatory con-
tract.

**Same:** VALIDITY OF CONTRACT: ACTION BY TAXPAYER.   An individual

taxpayer of the city may test the validity of a contract, arbitrarily awarded on competitive bids, to one shown not to be the lowest competitive bidder, without regard to the effect the contract may have on the tax upon his individual property.

Same: REPAYMENT OF CONTRACT PRICE. Although the contract under which the city printing was done, was void, because the rights of lower responsible bidders were arbitrarily ignored, still as the printing company to whom the contract was awarded acted in good faith, did the work which was required for current and immediate demands for a reasonable price, and before a determination of the action or other interference by injunction the work was completed and accepted by the city, and as the company could not be placed in *status quo:* It is held that to decree repayment by the printing company of the amount received would be unjust and inequitable.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

FRIDAY, JULY 2, 1909. ·

ACTION in equity for an injunction to restrain the performance of a contract entered into by the city and for other relief. Bill dismissed, and plaintiffs appeal. The material facts are stated in the opinion.—*Reversed* in part, and *affirmed* in part.

*Bowen & Bremner* and *Parrish & Dowell,* for appellants.

*Wm. H. Baily, C. O. Holly* and *W. E. Miller,* for appellees.

WEAVER, J.—Ordinance No. 452 of the city of Des Moines, passed December 17, 1888, and amended April 17, 1899, enacts and establishes certain regulations concerning supplies procured or purchased for the use of the city. So far as is material to this case said ordinance is in the following words:

Advertising for Supplies.   Section 1.   The city clerk is hereby required to advertise in at least two newspapers published in the city of Des Moines for three weeks, two insertions each week, for bids for furnishing all supplies of every kind for the several departments of the city not required to be advertised for by the board of public works. Whenever such supplies, together with the printed matter required to be advertised for by the board of public works, includes printed stationery, printed blanks, printed reports or other printed matter, the same shall have printed thereon the Allied Printing Trades Council Label.

Statement of Supplies Needed.   Sec. 2.   Each officer or board in charge of any department shall furnish and file in the city clerk's office thirty days before the first day of each fiscal year, a sworn, detailed statement of the supplies necessary for his or their department during the next fiscal year.

Penalties.   Sec. 3.   Any person violating any of the provisions of this ordinance shall be subject to a fine of not less than $5 nor more than $10.

On December 19, 1899, an ordinance, No. 1060, was enacted providing that all proceedings, ordinances and resolutions of the city council shall be published in pamphlet form under such regulations as may be imposed by the council.   It was also further provided that the contract for the production of such pamphlets shall be let to the lowest bidder after a period of advertising for proposals.   On July 18, 1906, Ordinance No. 1383 was passed, amending section 3 of Ordinance 1060, to make the same read as follows:

The city clerk shall each year, at the time of advertising for bids for supplies, advertise by two insertions in each of two daily papers for sealed proposals for publishing said pamphlets for the next year.   Said bids when received shall be submitted to the council at their first meeting after bids are received, the contract shall be made with the lowest responsible bidder, but the council may reject all bids and direct the clerk to advertise for new proposals;

each bid shall be accompanied by a certified check in the sum of $50, payable to the order of the treasurer as security that the bidder will enter into contract for doing the work, and give the bond required. The contract shall be prepared by the solicitor and executed by the mayor on behalf of the city, and shall be accompanied by a bond in the penalty of $500, with a corporate surety, conditioned for the faithful performance of the contract. Said contract and bond shall be filed with the city clerk, but the city shall not be bound thereby until the contract and sureties in the bond have been approved by the city council. All ordinances and parts of ordinances inconsistent herewith are hereby repealed.

Pursuant to the terms of the last-mentioned ordinance the city clerk advertised for proposals for the work of publishing the council proceedings for the year beginning April 1, 1908. Responding to this call bids were tendered by eight different firms or companies doing business as job printers in the city of Des Moines, as follows:

| | | |
|---|---|---|
| Bischard Bros ...................... | $1 12 | per page. |
| Welch Printing Company............ | 1 01 | " ". |
| Iowa Printing Company............. | 97 | " " |
| Register & Leader Company.......... | 95 | " " |
| Kenyon Printing Company........... | 93 | " " |
| Homestead Company ............... | 92 | " " |
| G. A. Miller Printing Company....... | 89½ | " " |
| Globe Publishing Company.......... | 89 | " " |

On May 14, 1908, the council voted to award the work to the Register & Leader Company, and directed the mayor to enter into a contract with said company on the terms of its bid. The contract was executed accordingly on or about the date last mentioned, and the printing of the council proceedings for the fiscal year has been done by the Register & Leader job office under the terms of said agreement. On May 16, 1908, this action was instituted. The plaintiffs.

are taxpayers in Des Moines, and are severally engaged in business as job printers in said city. The mayor, the city auditor, clerk and treasurer, and the Register & Leader Company are impleaded with the city as defendants.

The petition alleges that, of the eight bidders for the work of printing the council proceedings as hereinbefore shown, the four whose bids were lower than the bid of the Register & Leader Company conducted what is known as non-union offices—that is, the said bidders did not employ exclusively what is known as "union labor"—and could not lawfully attest their work with the "union label," for which reason, as plaintiffs allege, the city council wrongfully and without authority of law excluded the bids of such non-union competitors from consideration in awarding the contracts and awarded it to the Register & Leader Company, not because it was the lowest responsible bidder in fact, but because it was the lowest bidder among the union offices competing for the job. The petition proceeds to aver that each of the non-union bidders is the proprietor of a well-established job printing business, with an office well supplied with all facilities to do good work of the kind required, and was and is at all times ready, able and willing to do such work. Each is also alleged to be pecuniarily responsible, able to provide the bond required by the ordinances, and is in all respects as able and as well qualified to do and perform said work as are any of the competing union offices, save only in the right to attest their printed matter by the use of the union label. Plaintiffs also allege that Ordinance No. 452, as amended by No. 966, is void and of no effect as an attempt to authorize an unlawful discrimination between bidders of equal qualification and merit, thereby unreasonably restricting competition among bidders, and imposing undue burdens upon the taxpayers of the city. They allege that the council did follow and observe the provisions of said void ordinance in letting the contract in question, whereby the contract, as made, calls for an expenditure

of the public funds largely in excess of the sum which would have been required had it been let to the lowest responsible bidder as in law and in right it should have been. On this showing it is asked that a decree be entered adjudging said Ordinance No. 452 to be void, and that the city, its council and officers, be enjoined from carrying out the contract made with the Register & Leader Company, and from issuing or paying any warrants upon the city treasury for work done under said contract, and for general relief.

Answering the petition, the defendants say that the contract was let to the Register & Leader Company because it was the lowest responsible bidder for the work; that the use of the union label is a guaranty of the character of the work to which it is attached, and of the skill and labor employed therein, and that said label is copyrighted, but the use thereof is free to all persons who comply with certain reasonable conditions. They also deny that plaintiffs have any such interest in the matter of said contract for printing the council proceedings as enables them to maintain this action, and allege that the difference in expenditure between the cost of the printing at the contract price and the cost computed on the basis of the lowest bid therefor is only about $120—a merely nominal sum as compared with the taxable value of property within the city—and that it is therefore impossible that plaintiffs should be irreparably injured because of the alleged wrong or irregularity in the manner of letting the contract. They also deny each and every allegation of the petition imputing to them any wrongful or unlawful act or purpose in the consideration of the bids or in awarding the work to the successful competitor.

No preliminary injunction was issued, and some six months after the commencement of this action plaintiffs filed an amendment to their petition alleging that during all the time since the filing of the petition the city and the Register & Leader Company have been carrying out the con-

tract made as aforesaid, and that in compensation of the work so done the city has paid the said company considerable sums of money, for a return of which judgment is demanded. The Register & Leader Company answer these complaints by alleging that it was duly adjudged by the council to be the lowest bidder, and that no consideration other than the amount and character of the work and the price to be paid entered into or was considered in awarding to it the contract; that relying on said contract, and carrying out its terms in good faith, it has performed the work demanded by the city, and received its pay therefor, and that the price paid is reasonable and just. It also avers that the use of the union label on the printing done was not considered or in any manner referred to in the bid of said company or in the contract entered into between it and the city for the said work. All the defendants aver that Ordinance No. 452 was repealed by implication in enacting Ordinance No. 1383.

I. The controversy presented by this appeal is complicated by very few disputes of fact, while the questions of law involved, though not entirely easy of solution, are not difficult to state. The fact with which we are at this time principally concerned has reference to the manner and method pursued by the city council in passing upon the proposals tendered by the several bidders already named, and the considerations upon which the award was made. The evidence is undisputed that, with the possible exception of one, each of the bidders whose offer was lower than that of the Register & Leader Company was amply able, ready and willing to accept the contract on the basis of their several bids, and to perform the same promptly in an efficient and workmanlike manner. Nor is there any claim that the sufficiency of their qualifications in this respect was unknown to any member of the council. They were well-known proprietors of job printing

1. MUNICIPAL CORPORATIONS: public printing: competitive bids: discrimination in favor of union labor.

offices in the city, or, if not well known, there is not the slightest evidence of any attempt on the part of any member of the council to inquire into the facts and ascertain whether they or any of them could perform the work if awarded the contract. The council at the time in question consisted of a mayor and four members as follows: Mayor A. J. Mathis and Councilmen McVicar, Ash, Hamery and Schramm. Of these, the first four were called as witnesses by the plaintiff, and, upon being interrogated as to the awarding of the contract and the reasons controlling the same, Mayor Mathis, after saying that he speaks only for himself, proceeds as follows:

I investigated far enough to know that, at the time this resolution was passed, that the company the contract was awarded to used the union label in accordance with the ordinance passed some years ago. That was as far as I went when I determined that the Register & Leader Company was the lowest bidder who used the union label. In addition to that I was fully satisfied that they would do good work. . . . I carried my investigation far enough to determine that the Register & Leader Company used the union label, and that was as far as I went. They had done good work for me. I knew that they were prompt in those things. . . . I made no investigation whether the Kenyon Printing Company, the George A. Miller Printing Company, the Homestead, or the Globe Publishing Company could do the work in a prompt and efficient manner.

Mr. Ash having testified that he had inquired as to the kind of work done by the Register & Leader Company, and found that it had a good reputation for promptness and quality of work, further says that the provisions of Ordinance No. 452 were talked of between him and the city clerk, and, while he had no personal knowledge on the subject, he understood that the Kenyon Printing Company, the George A. Miller Printing Company, the Homestead, and the Globe Publishing Company were non-union offices.

It was not his understanding when the vote was taken that the council intended to let the work to the lowest union bidder without regard to the quality of the work, but "to the lowest responsible union bidder whose work came up to the standard." Mr. Hamery testifies that he made some investigation prior to the award, and found that there was objection to the Globe Publishing Company on account of the quality of some work it had done for the city on a former occasion. He further says:

I ascertained that the Register & Leader Company was the lowest union bidder. In my observation. I have always found that union labor is the best labor that can be obtained for the money, and, consequently, I gave my vote, thinking they would use the best labor. I did not make any inquiry to ascertain whether any of the companies bidding lower than the Register & Leader were paying higher wages than the union scale. My idea was to get the best responsible bidder, and get the best work for the money, and get it out in a short time, and my conclusion as to this being the best bid was because union labor supplies the best work.

Mr. McVicar being called to the stand was asked whether the provisions of Ordinance 452, requiring the union label on matter printed by the city, was taken into consideration by the council in awarding the contract, answered: "It was a consideration, but not the only consideration." On cross-examination he added that the council took into consideration the responsibility of the bidder, its equipment for the work, and its promptness in performing its contracts. It was important that the proceedings be published accurately and promptly and at a reasonable price. These things were of equal or greater importance than union labor. On redirect examination as to his investigation and knowledge of the ability of the lower bidders, he said:

I had experience with the Kenyon Company when it

was a union shop—when it was a reliable firm. Have had no experience with it when it was an open shop. Its bid of ninety-three cents per page was a reasonable price for the work. Had no experience with the Homestead Company and knew nothing to the contrary of their being a reliable shop. Did not know but they were perfectly reliable, efficient and prompt. Had no fact on which to determine that they were not, except they were employing non-union labor. When the George A. Miller Company was a union shop their work was all right. I have no fact on which to conclude that they were not a reputable shop now or on May 7th except their employment of non-union labor. And the same is true of the Kenyon Company. The prior work of the Globe Company had not been acceptable, and it was not properly equipped to handle the work. My experience is that there is a difference in union and non-union printing, and I would give the union shop the preference because I think I would get better work. In awarding the contract I took nothing into consideration except those things I regarded necessary for the best interests of the city, and I think the same considerations controlled the other members of the council.

The fourth councilman, Mr. Schramm, was not a witness on the trial.

We shall not take time for an extended discussion of this evidence. Considered in the light of all the facts developed on the trial it is impossible to escape the conclusion that, whether Ordinance No. 452 was or was not regarded by the council as of any present force or validity, the non-union bidders for this work were excluded from the competition, not because they lacked financial responsibility, business facilities, office equipment, experience or reliability, but because they employed non-union labor, and the contract was awarded to a higher bidder because it was the lowest among those bidders employing union labor. It may be true that in the absence of union bidders, or possibly in the absence of any competition between union bidders, the council would have felt at liberty to award the contract to a

non-union shop, but, with both present and bidding, there is here exhibited a set purpose to give the preference to a union bidder even at a larger price, so long at least as there was reason to believe the latter able to perform the required service satisfactorily.

It is said by appellees, and correctly, that neither in the notice to bidders, the resolutions of the city council, nor in the contract with the Register & Leader Company is

2. SAME.

there any mention of union shops or of the · use of the union label; but this is not decisive of the question at issue, if it further appear with reasonable certainty that this test was in fact applied, in awarding the contract, and discrimination made between the bidders upon that ground. That such discrimination was made is bluntly admitted by the mayor, the official head of the council. The testimony of the three councilmen on this point is somewhat more diplomatic in expression, but points not less unerringly to the same conclusion. In other words, with eight equally competent and responsible bidders seeking the contract, competition was limited by the council to the four highest upon the list, because they or some of them were privileged to use the union label, while the four others, whose bids were lower than the lowest union bidder, were excluded because of their employment of non-union labor. We have then to inquire whether such discrimination is within the discretion which the laws of the state and the ordinances of the city gave to the council.

No attempt is made in argument to uphold the validity of Ordinance No. 452. That it is an unwarranted excess of the legislative power vested in the council is too clear for argument. Government is instituted for the benefit of all the people and not for the benefit of any one class to the exclusion of others. City officials are charged with the collection and disbursement of vast sums of money to which all the people must contribute in proportion to their estate without regard to social position, political affiliation, re-

ligious belief or economic theories. Experience has shown that the interests of the taxpayers are best conserved by offering contracts for public work to the competition of all persons able and willing to perform it. When the opportunity to compete is fairly and openly offered, and contracts are fairly awarded, there is ordinarily no room for official or private graft at public expense; but just in proportion as competition is restricted, and the award is hedged about with express or implied conditions by which a favored person or a favored class is insured a preference over others of equal ability and capacity, public rights are imperiled and public interests are sacrificed. Such discrimination tends to monopoly, and involves a denial of the equality of right and of opportunity which lies at the foundation of republican institutions. Appellees argue that this ordinance was impliedly repealed by the subsequent ordinance which requires printing contracts to be let to the lowest responsible bidder, and that its validity or its invalidity is not a material consideration here. That the members of the city council did not regard it as repealed is very clear from a reading of the record, but whether they believed it of binding force or effect is a subject into which we do not stop to inquire, so long as it is perfectly apparent that they did make the distinction and exclude one-half of the bidders from equal opportunity and consideration in the competition. Dealing with a very similar situation the Supreme Court of Illinois has well said: "It is immaterial whether there was any attempted ordinance as a basis for such action, or whether it had been approved. The statute and the ordinance required the contract to be let to the lowest bidder, and this impiled equal opportunity and freedom to all who might choose to bid. The Sentinel Democrat Printing Company could not claim to be the lowest bidder when another and lower bid was rejected under such an arrangement to prevent other persons from competing." *Holden v. Alton,* 179 Ill. 318 (53 N. E. 556).

If, then, as tacitly conceded in argument, the enactment of such an ordinance is beyond the legislative authority of the city council, it follows as a matter of necessity that it can not indulge in such discrimination in its administrative capacity. The citizen may be rich or poor in purse; union or non-union upon the labor question; Catholic, Protestant, Jew, or infidel in matters of religion; Republican, Democrat or Prohibitionist in political affiliation; but, by the standard of constitutional and statutory right, he is neither more nor less than a citizen of the state, entitled to an equal opportunity therein according to the capacity and ability with which nature may have endowed him. In denying him that opportunity a double wrong is perpetrated, first, upon the individual who is entitled to be considered upon his personal merits uninfluenced by these extrinsic considerations; and, secondly, upon the state at large, whose expenses are multiplied, and whose integrity is jeopardized by a system of favoritism, the demoralizing effect of which is patent to every thoughtful student of public affairs. It is not material that the sum of money involved in this controversy is insignificant as compared with the city's revenue or its ability to pay. The mischief is not so much in the particular case under review, as in its tendency and in the far-reaching consequences of legitimizing a system or practice so pregnant with evil possibilities. As strikingly in point in this discussion, we quote again from the Illinois court in passing upon an order of a local board of education requiring its work to be done by union labor.

It is plain that the rule adopted by the board and included in this contract is a discrimination between different classes of citizens and of such a nature as to restrict competition and to increase the cost of work. It is unquestionable that if the Legislature should enact a statute containing the same provision as this contract in regard to any work to be done for boards of education, or if they should

by a statute undertake to require this board as an agency
of the state to adopt such a rule or insert such a clause in
its contracts, or should undertake to authorize it to do so, the
provision would be absolutely null and void as in conflict
with the Constitution of the state. . . . There seems,
however, to be a claim that the board of education, al-
though it could not be lawfully required or authorized to
make such a contract may have some sort of discretion so
to do, and the only question in the case on the subject is
whether the board possesses power beyond that of the Legis-
lature, in which is vested the entire legislative power of
the state. . . . There can be no greater power of the
board to act of its own motion than by virtue of positive
law. The results in either case are equally in conflict with
organic law, and such legislation, contract or action, what-
ever form it may take, is void. Nor can the fact, if it be
a fact, that an individual might make such a bargain au-
thorize these officers exercising a public trust to do so. The
individual may, if he chooses, give his money away, but the
public officer acting as a trustee has no such liberty, and
no right to surrender to a committee or to any one else the
rights of those for whom he acts. *Adams v. Brenan,* 177
Ill. 194 (52 N. E. 314, 42 L. R. A. 718, 69 Am. St. Rep.
222).

It is true that in the cited case the discrimination con-
demned by the opinion was expressly stipulated for in 'the
contract, but the principle is no less applicable to a case
where the discrimination is actually applied in awarding
the contract, for, the right and power to make it being
wholly wanting in the Legislature or in the city council,
the result is the same, and the action "whatever form it
may take, is void."

For the purposes of this action it may be freely con-
ceded that the council and its members acted in perfect
good faith, influenced by the belief that in giving the con-
tract to the lowest union bidder they were in some way
serving the best interests of the city, but the question here
presented is not one of good faith, but of power and juris-
diction. Undoubtedly there is good authority for the propo-

sition that in selecting or ascertaining the "lowest responsible bidder" the council may take into consideration the comparative ability and qualification of the several bidders for the proposed work, and that the lowest price bid is not in every instance a controlling factor. But this rule, if adopted, presupposes that all bidders are given an equal opportunity, and that there is applied to them no arbitrary classification by which those of one class are to receive no consideration so long as a satisfactory bidder can be found in the other class. An award so made is not the result of the exercise of legal discretion. It is manifest abuse of discretion. *Holden v. Alton, supra; Atlanta v. Stein,* 111 Ga. 789 (36 S. E. 932, 51 L. R. A. 335); *Attorney General v. Detroit,* 26 Mich. 263; *Avery v. Job,* 25 Or. 512 (36 Pac. 293); *Faist v. Mayor,* 72 N. J. Law, 361 (60 Atl. 1120); *State v. Board,* 57 N. J. Law, 580 (31 Atl. 613); *State v. Toole,* 26 Mont. 22 (66 Pac. 496, 55 L. R. A. 644, 91 Am. St. Rep. 386); *People v. Gleason,* 121 N. Y. 631 (25 N. E. 4); *Lewis v. Board,* 139 Mich. 306 (102 N. W. 756); *Inge v. Board,* 135 Ala. 187 (33 South. 678, 93 Am. St. Rep. 20); *Goddard v. Lowell,* 179 Mass. 496 (61 N. E. 53).

That a taxpayer may maintain an action to test the validity of contracts awarded upon bids thus arbitrarily considered and other contracts in excess of authority is

**3. SAME:** also well settled. The amount by which the
validity of
contract:
action by
taxpayer.
tax upon his individual property may be increased, if at all, will not be inquired into.

The case so presented will be heard on its merits, not alone to protect the rights and interest of the individual plaintiff, but to safeguard the rights of the general public of which he is in a sense the representative in the action. *Inge v. Board, supra; Northern Co. v. Snyder,* 113 Wis. 516 (89 N. W. 460, 90 Am. St. Rep. 867); *Heath v. Albrook,* 123 Iowa, 559; *Dunham v. Fox,* 100 Iowa, 131; *Holden v. Alton,* 179 Ill. 318 (53 N. E. 556).

Finding as we do that the award of the contract was made arbitrarily, and not in the exercise of the legal discretion of the council upon consideration of the comparative merits of all the bids presented, we must hold the action void, and that the suit to adjudicate its validity is maintainable by the plaintiffs as taxpayers of the city.

II. We have left us to consider the effect of these conclusions upon the rights of the party to whom the contract was awarded. There is nothing in the record to indicate that this bidder or any other of the competitors employing union labor acted in bad faith, or brought to bear any improper influence upon the council to secure a preference in the award, but, as already remarked, the good faith of any or all of the parties can not avail to give life to the contract when it is once determined that the council had no authority to make it in the manner in which it was attempted to be made. If that contract be void as we have found it to be, it must be held void as to all parties thereto. In anticipation of this holding the appellants have asked that we adjudge the Register & Leader Company not entitled to receive payment for the work it has done under this contract, and that the amount paid for such service be recovered for the benefit of the city treasury. If this were an action at law, and the holder of the contract were in court asking a recovery thereon against the city, the demand would be denied as a matter of course and under some circumstances a return of the money already paid could well be adjudged. But plaintiff's action is in equity. It was begun at or about the opening of the fiscal year. A temporary injunction against the execution of the contract was not sued out, nor was any measure taken to prevent the parties from proceeding thereunder except as pendency of the suit might act as a deterrent until after the cause had been decided in the trial court and its decision was brought here for review upon appeal. Meanwhile, the wheels of

4. SAME: repayment of contract price.

municipal government could not stand still, and public printing could not be suspended pending the outcome of slow moving litigation.   A contract was outstanding which if finally upheld, would render the city liable to the contractor for withholding the work and the contractor liable to the city for refusing to do the work when tendered.   The judgment of the district court affirmed the validity of the contract, and from that date the parties had apparent judicial sanction for continuing to observe its apparent obligation.   Under such circumstances the city could not well readvertise and let the work to another contractor, thus adding confusion to a situation already sufficiently complicated.   No bond had been put up by the plaintiffs to indemnify the city in case the bill was dismissed.   Even had a temporary injunction issued against further performance of the contract it was probably within the general powers of the city to procure from some source the printing required by current and immediate demands and in such case there was nothing to prevent its applying to the same company so long as the work was properly done at reasonable rates.   In any event the work has been done; it has been accepted by the city; it is of a character which can not be returned to the contractors and thus place them in *statu quo;* it is work which if not done by this contractor would have to be done by some other person; the prices charged are not shown to be unreasonable; the invalidity of the contract is not chargeable to any wrong or omission on the part of the contractor, but solely to the act of the city through its council.   To say that the party doing such work must receive no remuneration therefor, and must return the compensation already received, is to impose all the penalty upon an innocent party for the profit of the only party chargeable with the wrong.   We are not disposed to so order.   Courts of equity often refuse to enforce a naked legal right where the results would be manifestly unjust or unconscionable.   An illustrative case is found in *Pickett v. School*

*District,* 25 Wis. 551 (3 Am. Rep. 105), involving a con-. tract improperly made by the governing board with one of its members for the building of a schoolhouse. Before the building was entirely completed litigation arose, and the district sought to have the contract declared void. The court there approves the doctrine that, in cases where the thing contracted for is itself against public policy, no right of recovery exists either upon the contract or upon *quantum meruit;* but where the subject-matter of the contract is itself lawful and beneficial, and the objection goes only to the manner. or method in which it has been awarded or made, it is inequitable to allow the party entitled to avoid it to receive and retain the benefit without any compensation at all. Under somewhat similar circumstances the Minnesota court has said that if property which a board of public officers is authorized to purchase is accepted and retained by the municipality it is just and reasonable that it be held for the reasonable value thereof, although the contract of purchase under which it was delivered was unauthorized or unratified. "The corporation could not be permitted to repudiate the contract and retain the fruits of it." *Currie v. District,* 35 Minn. 163 (27 N. W. 922). In point, also, is *Gardner v. Butler,* 30 N. J. Eq. 702.

We apply the principle to the case before us the more readily from the fact that the appeal was not submitted to this court for decision before the expiration of the term for which the disputed contract was made. We might perhaps be justified in refusing to pass upon the merits of the controversy, because, by the lapsing of the contract, the dispute over its validity is to a great extent reduced to a discussion of academic propositions. In view, however, of the importance of the case as a precedent we have felt it our duty to ignore that feature. Indeed, we assume that appellant's motive in bringing the action was not so much to save the comparatively trifling sum involved in setting aside this contract as it was to have the invalidity of the proceedings

by which the award was made adjudicated and determined as a protection to themselves and to the public against similar irregularities in the future. That end is attained by our decision as already announced. Without, therefore, attempting to define what rights at law, if any, the city may have with respect to so much of the contract compensation, if any, as remains unpaid, the record as it stands does not call for equitable interference. For the reasons stated, the decision of the district court dismissing plaintiffs' demand for judgment against the contractor is affirmed, and in all other respects reversed. Decree will be entered in this court at the option of the appellants, exercised within thirty days; otherwise, the cause will be remanded to the trial court for decree not inconsistent with the views here expressed.—*Reversed* in part. *Affirmed* in part.